# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Statesboro Division

| | | |
|---|---|---|
| In the matter of: | ) | Chapter 11 Case |
| | ) | |
| CLUBHOUSE INVESTMENTS, INC. | ) | Number <u>09-61175</u> |
| | ) | |
| *Debtor* | ) | |
| | ) | |
| | ) | |
| | ) | |
| D. ROBIN SMITH | ) | **FILED** |
| LANE U. SMITH | ) | Samuel L. Kay, Clerk |
| | ) | United States Bankruptcy Court |
| | ) | Savannah, Georgia |
| *Movants* | ) | By lbarnard at 5:47 pm, Jul 08, 2010 |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLUBHOUSE INVESTMENTS, INC. | ) | |
| | ) | |
| *Respondent* | ) | |

## <u>MEMORANDUM AND ORDER</u>
## <u>ON MOTION FOR RELIEF FROM STAY</u>

Debtor's case was filed on December 11, 2009. Its business consists of ownership and operation of multiple Huddle House franchise restaurants, all of which are located in the state of Georgia. D. Robin Smith and Lane U. Smith (the "Smiths" or "Movants"), as lessors, contend that they validly terminated their lease of a Huddle House in Athens, Georgia to Clubhouse Investments, Inc. ("Debtor" or "Clubhouse") prior to the filing of the petition. Debtor contends that the lease had not been validly terminated when

it filed its Chapter 11 petition. The Smiths now move for relief from the automatic stay, claiming that because the lease was terminated pre-petition, it is not property of the bankruptcy estate. The parties have stipulated to a number of uncontested facts in this case which are fully incorporated herein. Amended Stipulations, Dckt. No. 182 (June 1, 2010). After a lengthy hearing, and after consulting these stipulations and relevant law on the matter, I make the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Movants, the Smiths, are successors in interest to a 1991 ground lease in favor of Charles L. Upchurch (the "Ground Lease"). Amended Stipulations, Dckt. No. 182, ¶ 1. It was assigned to the Smiths and in 1999 they became lessors to Many's Food Stores, Inc., pursuant to a 1999 Sublease. Id. at ¶ 2. The 1999 Sublease defined Lessee (Many's at the time)[1] to include "successors, assigns, heirs and representatives of the lessee." Exhibit A, Dckt. No. 176, ¶ 40 (June 8, 2010). It expressly permitted Many's, at any time with or without the consent of the Smiths, to "sublease, assign or encumber its interests, rights, privileges and obligations arising out of this Lease Contract." Id. at ¶ 18. It further provided that a sublease, as opposed to an assignment, "shall in no way alter or affect the Lessor - Lessee relationship then existing between them [Many's and the Smiths] and that Sublessee [Clubhouse] shall be the tenant of the Lessee [Many's], and liable directly to [Many's]

---

[1] For the sake of clarity, "Lessee" will mean either Many's or Clubhouse, whichever was the Sublessee at the time in question.

only."[2]  Id.  In 2001 Many's assigned (but did not sublease) that lease to Debtor.  Amended Stipulations, Dckt. No. 182, ¶ 3.

In the 2001 assignment Clubhouse assumed all of Many's "rights, duties, privileges and obligations under the Lease."  Exhibit C, Dckt. No. 177, ¶ 2 (June 8, 2010). Accordingly, while Many's was the original sublessee, for the purposes of this Order the Smiths are the lessors and Clubhouse is the lessee of the 1999 Sublease referenced above.

The 1999 Sublease provided that

1) "Lessee shall pay . . . all . . . County and City taxes (including but not limited to ad valorem taxes[)] . . . upon Premises, and any improvements or additions thereto or thereon."  Exhibit A, Dckt. No. 176, ¶ 8.

2) That the following are events of default: (a) non-payment of rent, and (g) Lessee's failure "to comply with any term, provision, covenant or condition of this Lease." Id. at ¶ 27.

3) That the Smiths were required to give the Lessee "notice of each and every Event of Default, as it or they occur, and Lessee shall have ten (10) days from the date of the receipt of such notice to cure any and all Events of Default described hereinabove."  Id.

4) That if any notice, demand or communication became necessary or convenient for one of the parties "such notice, demand or communication shall be in writing, signed by the party serving the same, deposited in registered or certified United States Mail, return receipt requested, [and]

---

[2]This language in the lease agreement mirrors Georgia state law.  *See e.g.*, Dozier v. Wallace, 169 Ga. App. 126, 128 (1983)

AO 72A
(Rev. 8/82)

postage prepaid . . . ."  Id. at ¶ 37.

Rental terms were contained in Paragraph 4 and taxes were separately provided for in Paragraph 8.  Id. at ¶¶ 4, 8.

The 1999 Sublease contained "special stipulations" attached to the agreement as Exhibit "B."  Id. at p. 16, Exhibit "B" ¶ 2.a.  They provided that Many's / Debtor assumed and agreed "to perform each and every act, covenant, and duty required of [the Smiths under the ground lease] . . . with the single exception of the rental amount, which will be paid to the owner directly by [the Smiths]."  That ground lease was attached to the Sublease as Exhibit "C."  It required that the owner pay "all ad valorem taxes assessed against the land value of the Leased Premises" and that the Smiths' predecessor, and now the Smiths were required to "reimburse" the owner for one-third of the amount of the ad valorem taxes on the land value.  See Exhibit D, Dckt. No. 177, ¶ 11.1.  The Smiths were responsible for payment of all taxes and assessments levied against the improvements on the land.  Id. at ¶ 11.0.

In an attempt to simplify the discussion, and to relate its provisions to the parties before the Court, the ground lease simply required the owner to pay all land taxes and the Smiths to pay ad valorem taxes on the value of the improvements, plus reimburse the owner for one-third of the land taxes.  Pursuant to the Sublease the Smiths required Many's, and ultimately Debtor, to pay all of the ad valorem taxes on the property, both for land and

improvements.

The Athens-Clarke County tax commissioner billed these taxes on two separate bills, the "A" bill covering the taxes on the land and the "B" bill covering the taxes on the improvements. Those tax bills were duly sent by the tax commissioner for a number of years to Debtor at its designated address, Post Office Box 1111, Millen, Georgia. Some time in 2007, because of a corporate dispute, Debtor notified the tax commissioner that its bills in the future should be forwarded to Post Office Box 888—still in Millen, Georgia— rather than Post Office Box 1111. Testimony revealed that one of Debtor's former principals, who had left the company under less than cordial circumstances, continued to maintain Post Office Box 1111. In many instances, although perhaps not all, that individual or the Postmaster directed mail, which had been addressed to Clubhouse Investments at the old post office box, to Clubhouse.

For reasons not fully understood by this Court, a portion of the county ad valorem taxes became delinquent in 2007 and remained so until the fall of 2009. On November 20, 2009, a certified letter was sent from the law firm of Fortson, Bentley and Griffin in Athens, Georgia—on behalf of Robin Smith (as client), but not so identifying co-movant Lane Smith—to Debtor at Post Office Box 888, Millen, Georgia. The letter demanded payment of unpaid taxes, included a number of tax bills from Athens-Clarke County, Georgia, and set forth unpaid amounts from 2007, 2008, and 2009 totaling $11,226.82. Amended Stipulations, Dckt. No. 182, ¶ 11; Exhibit Q, Dckt. No. 177. The

letter, addressed to Debtor,  provided

> You have ten (10) days from the date of your receipt of
> this letter to cure your default by paying the back taxes
> owed.  Importantly, if you fail to cure your default of the
> lease agreement, my Client intends to pursue all legal
> remedies available to him under Georgia law and the lease
> agreement.

Mr. Smith had previously contacted Chad Holton, an officer of the Debtor,
when he saw a legal notice in the *Athens Banner Herald* indicating that a tax levy was
impending over the premises for unpaid taxes for the years 2007-2009.  When Smith notified
Holton, Mr. Holton promised to look into the matter right away.  Shortly thereafter Debtor
tendered to the tax commissioner a check in the amount of $10,194.47 which it believed
cured the arrearage based on conversations its agents had with the commissioner's staff.
When that money was received, however, the tax commissioner applied the proceeds not
solely to the property which is the subject of this Motion, but partially to this property and
partially to another premises operated by Debtor on which there were also outstanding ad
valorem taxes.

When the demand letter from Fortson, Bentley and Griffin was received by
Debtor's management it was mistakenly and carelessly assumed that the demand letter and
the tax payment had crossed in the mail because the amounts were of similar magnitude

although not exactly the same.[3]  The demand letter was received on November 23, 2009. When no payment was forthcoming, a notice of termination of lease was forwarded on December 10, 2009, by the law firm of Fortson, Bentley and Griffin to Debtor at Post Office Box 888, Millen, Georgia.  That letter reminded Debtor that the November 20, 2009, letter received on November 23, 2009, demanding past due taxes had required payment on or before December 8, 2009.  The letter further stated that full payment had not been received by either the landlord or the Athens-Clarke County tax commissioner and stated

> [T]he lease is hereby terminated pursuant to Paragraph 27 thereof.  As a result of your non-payment of taxes and termination of Lease, the Landlord hereby demands that possession of the Premises be returned not later than 12:00 p.m. noon on December 14, 2009.

Exhibit R, Dckt. No. 177.  That letter was sent by Certified Mail, return receipt requested, postage prepaid, to what is stipulated to be the proper address of Debtor.  It was received on December 14, 2009.  In addition to certified mail, Movants' counsel also sent by Federal Express overnight delivery a copy of the same letter which was dispatched on December 10, 2009, and was received by Clubhouse Investments at 833 East Winthrop Avenue, Millen, Georgia, on the following day, December 11, 2009, at 11:31 a.m.  Amended Stipulations, Dckt. No. 182, ¶ 12;  Exhibit S, Dckt. No. 177.  Debtor's bankruptcy petition was filed on

---

[3]The letter, dated November 20, 2009, claimed a deficiency of $11,226.82.  Exhibit Q, Dckt. No. 177. Debtor had just sent the tax commissioner a check for $10,194.47.  Exhibit P2, Dckt. No. 177.

the same day at 12:16 p.m.[4]

For multiple reasons set forth in the parties' pleadings and in their briefs, Movants contend that a valid pre-petition termination of the lease occurred and that as a result stay relief is appropriate. Debtor asserts multiple defenses, including the following:

(1) That the amount demanded, $11,226.82, was an incorrect number and therefore insufficient notice of default was given.

(2) That the November 20, 2009, notice providing ten days opportunity to cure was not effective because Movant failed to comply with Paragraph 8 of the 1999 Sublease, which requires an earlier fifteen days notice that the taxes had not been paid when they came due. In other words, Debtor contends that it was entitled to three notices: First, fifteen day notice that the taxes had not been paid when due; second, notice demanding payment of the taxes and providing it ten days to cure that default; and third, separate notice of termination.

(3) That although the notice of termination was sent pre-petition it was not received in the manner required for notices until three days after the petition was

---

[4]The parties have stipulated that Debtor's petition was filed at 12:16 p.m. Amended Stipulations, Dckt. No. 182, ¶ 14. This Court's record shows that the petition was filed at 4:27 p.m. The difference is immaterial. Irrespective of which time is accurate, the Federal Express notice was received before the petition was filed and the Certified Mail notice was received after the petition was filed.

filed. Movant contends that notice was (a) effective when sent in the proper manner, or (b) that if receipt was required there was actual receipt of the alternative means of delivery of the notice, i.e., the Federal Express overnight package prior to the petition date.

(4) That it tendered a rent check to the Movant on December 5, 2009, and that Movant cashed that check at a time when it was aware that the termination letter had been mailed and that cashing the check under those circumstances constitutes a waiver of Movant's right to terminate.

(5) Finally, that the original November 20, 2009, notice of default, assuming that it is the first notice to which Debtor was entitled, was written on behalf of only one of the Movants. The notice was therefore insufficient under Paragraph 37 of the 1999 Sublease, which required such notice to be "in writing, signed by the party serving the same." Exhibit A, Dckt. No. 176 ¶ 37. Because counsel purported to represent only Robin Smith and not Lane Smith, the notice is ineffective under the terms of the lease. Indeed, in the heading to the sublease agreement "lessor" is identified as "D. Robin Smith and Lane U. Smith." Id. at p. 1.

CONCLUSIONS OF LAW

The issue before this Court is whether the lease was validly terminated before Debtor filed its petition. If it was, the lease is not part of the bankruptcy estate, if not, Debtor may assume the contract pursuant to 11 U.S.C. § 365.

## A.  State Law Controls

Courts are to turn to applicable state law to determine whether a lease was terminated prepetition.  <u>In re Everest Crossing, LLC</u>, 416 B.R. 361, 362 (Bankr. D. Mass. 2009); *see also* <u>In re Hickory Point Indus., Inc.</u>, 83 B.R. 805, 806 (M.D. Fla. 1988) (applying Florida law to determine if a prepetition termination had occurred).  Georgia law therefore governs my analysis.

## B.  Forfeiture is not Favored

Generally, Georgia courts avoid forfeitures when possible.  Georgia courts have held that "[f]orfeiture of a lease by acts of a party to a lease because of a breach of a covenant or condition is not favored, but where there is an express provision in the contract, termination or forfeiture of the lease will be permitted." <u>Woody's Steaks, LLC v. Pastoria</u>, 261 Ga. App. 815, 819 (2003) (quoting <u>C & A Land Co. v. Rudolf Inv. Corp.</u>, 163 Ga. App. 832, 833 (1982)).  That is to say, Georgia courts prefer not to allow forfeiture of a lease, but will enforce a contract that expressly calls for it.  This maxim provides no definitive answer to the issue at hand, but it gives guidance in applying the mandates of Georgia state law.

## C.  Substantial Compliance

Movants contend that they substantially complied with the lease's notice provisions, and that substantial compliance is all that is required to comply with a contract under Georgia law.  To bolster this contention, Movants direct this Court to <u>Labat v. Bank of Coweta</u>, 218 Ga. App. 187 (1995).  In <u>Labat</u>, the Georgia Court of Appeals held that

✎AO 72A
(Rev. 8/82)

> [o]ur general rule with respect to compliance with contract terms is not strict compliance, but substantial compliance. At common law a strict and literal performance of the terms of the contract was required; but by rules of equity, either adopted by statute or recognized by the courts, a substantial compliance with the terms of the contract is sufficient . . . .

Id. (citing Bldg. Materials Wholesale v. Reeves, 209 Ga. App. 361, 363 (1993) and O.C.G.A. § 13-4-20). The full text of O.C.G.A. § 13-4-20 provides that

> Performance, to be effectual, must be accomplished by the party bound to perform, or by his agent where personal skill is not required, or by someone substituted, by consent, in his place, and must be substantially in compliance with the spirit and the letter of the contract and completed within a reasonable time.

Movants note that although the termination notice was not received via Certified Mail until after the Chapter 11 case was filed, Debtor received actual notice via Federal Express before it filed its bankruptcy petition. Thus Movants contend that they substantially complied with the notice provision—despite the notice coming via a method different from the one prescribed by the contract—and that substantial compliance with the notice provision is sufficient to terminate the lease.

D. Strict Compliance

After Labat, the Georgia Court of Appeals revisited the issue of compliance with notice provisions, and once again held that "[t]he general rule in determining contract compliance is substantial compliance, not strict compliance." Rome Healthcare LLC v. Peach Healthcare Sys., Inc., 264 Ga. App. 265, 272 (2003), *cert. denied*, (March 8, 2004). The court clarified the position further, stating that this rule also applies to the termination

clause, such that termination need only be in substantial compliance with the notice and termination provisions to be effective. Id.

However, the court noted that the it has required more than substantial compliance—but rather strict compliance—with termination and notice provisions in contracts that resulted in forfeiture of real property rights. Id. In fact, in DI Uniform Services, Inc. v. United Water Unlimited Atlanta LLC, 254 Ga. App. 317 (2002), the Georgia Court of Appeals enunciated this distinction more fully. In DI Uniform, the court—in holding that termination of a uniform supply contract was not subject to strict compliance—distinguished compliance with a general contract termination clause from compliance with a termination clause that resulted in forfeiture of real property rights. Id.

The court in DI Uniform cited three cases from the Georgia Court of Appeals, each of which required strict compliance with a termination notice because the resulting termination would have resulted in the forfeiture of real property rights.

In Preferred Real Estate Equities v. Hous. Sys., 248 Ga. App. 745 (2001), Steak and Ale of Georgia, Inc. sold an office building to Patlyn Associates in 1981. Along with the sale, Steak and Ale granted an easement in the parking lot, subject to the requirements that Patlyn maintain the parking lot and pay the property taxes. S&A Properties Corporation purchased Steak & Ale's interest, and HSI purchased Patlyn's interest. Steak & Ale paid the property taxes on the parking lot for approximately sixteen years after the

transfer to Patlyn. In October of 1996, HSI received a letter from "S&A Restaurant Corp." requesting sixteen years of back taxes. When HSI did not comply, "S&A Restaurant Corp." attempted to terminate the easement. The court held that because the notice came from "S&A Restaurant Corp.," when the property was owned by "S&A Properties Corporation," notice of termination came from a party that was not the owner of the property, and notice was therefore insufficient. The court held that "where a party attempts to terminate an easement according to a forfeiture clause contained in a deed, the forfeiture clause is subject to a very strict construction, and the party attempting the termination must strictly comply with the terms of the clause." Id. at 747 (quoting Eagle Glen Unit Owners Assn. v. Lee, 237 Ga. App. 240, 242(1)(b) (1999)) (punctuation omitted).

In Cosby v. A.M. Smyre Mfg. Co., 158 Ga. App. 587 (1981), John H. Cosby—as an inducement for A.M. Smyre Manufacturing Company to extend credit to Delta Carpets—executed a personal guaranty on all of Delta's accounts. Part of the guaranty granted a lien on Cosby's real property to Smyre. When Delta refused to pay on the note, Smyre sought judgment against Cosby to the full extent of his lien agreement. Cosby claimed he had notified an agent of Smyre that he had revoked the guaranty, which by its own terms remained in force "until a written notice revoking it has been received." However, because Cosby could not provide a written revocation, the court held that Cosby was still bound by the guaranty. The court did not permit forfeiture of Smyre's lien on Cosby's real property without strict compliance with the termination notice provision.

✎AO 72A
(Rev. 8/82)

In <u>Woodall v. Pharr</u>, 119 Ga. App. 692, (1969), the court held that a default provision, which required two separate notices within a six month period, was designed to allow the lessee correct the default within that time period. Because the notice—which the court roughly translated as "I demand possession of the premises because you have not paid the rent which I will not accept"—precluded correction of the default, it was insufficient. <u>Id.</u> at 694-95. The court noted that "provisions in leases for forfeitures must be strictly construed." <u>Id.</u> at 693(1) (citing <u>Mendel v. Pinkard</u>, 108 Ga. App. 128, 134 (1963)).

In short, Georgia law requires strict compliance with a termination provision when such termination results in the forfeiture of a real property right. *See also* <u>In re D'Lites of America, Inc.</u>, 66 B.R. 558, 562 (Bankr. N.D. Ga. 1986) (applying Georgia law and requiring strict compliance with a termination provision which would result in the forfeiture of real property rights); <u>In re D'Lites of America, Inc.</u>, 86 B.R. 299 (Bankr. N.D. Ga. 1988) ("Because of the broad definition of property of a debtor's estate under § 541(a), this Court has adopted a strict interpretation of 'termination' of a lease, since termination removes from the debtor the option to assume or reject."); *Contra* <u>Solon Automated Servs., Inc. v. Corp. of Mercer Univ.</u>, 221 Ga. App. 856 (1996). In <u>Solon</u> the court held that notice of termination of a lease, which was incidental to a laundry contract, that did not strictly comply with the notice requirements—it was sent too early—was still sufficient because it served the purpose of the notice, i.e., to give the lessee time to take necessary action. In fact, the deviation from strict compliance served only to enlarge the lessee's rights, not to narrow them. <u>Id.</u>

E.  Notice of Default

Movants allege on two grounds that Debtor was notified of the termination prior to the filing of the petition.  First, Movants claim that the notice sent via Federal Express was sufficient to notify Debtor of the termination.  Second, Movants claim that even if the Federal Express notice was insufficient, the First Class mail notice was dispatched on December 10, 2009, and that such date is the date of the notice.

1.  The Federal Express Notice

I find that the notice sent via Federal Express is insufficient to terminate Debtor's rights in the real property.  The lease specifically contemplated that notice was to be sent via Certified Mail.  Movants were required to comply strictly with this notice provision to effectively terminate Debtor's interest in the real property.  As explained above, Georgia law requires strict compliance with termination provisions that result in a forfeiture of real property rights.  While Movants point out that the notice via Federal Express was actually received, the lease specifically requires notice to be sent via Certified Mail.  Non-compliant notice fails under a strict compliance test, no matter how seemingly insignificant the non-compliance may be.

Perhaps the parties agreed on First Class Mail, return receipt requested to allow the party receiving notice the extra few days provided by not sending the notice overnight. Perhaps the parties wanted the notice delivered at a certain time, when the regular mail delivery occurs.  Perhaps the parties were relying on the mailbox presumption that

"mailing a notice duly directed and stamped may furnish presumptive evidence of its receipt."[5] Favors v. Travelers Ins. Co., 150 Ga. App. 741, 744 (1979). Perhaps the parties wanted to avoid the expense of a courier service or wanted the assurance afforded to them by the United States Postal Inspection Service. It is not this Court's responsibility to inquire as to the reasoning behind the notice provision, but rather to uphold it.

Because Georgia law requires strict compliance with termination provisions that would result in the forfeiture of a real property right, and because the Federal Express notice was outside the allowable method for serving notice under the lease, I find the notice sent via Federal Express to be insufficient notice to terminate the lease.

## 2. The Dispatch of the Certified Mail

Movants claim that the language of the lease specifically requires receipt of the notice of default,[6] but makes no such requirement for the notice of termination.[7] Movants allege that such a difference is purposeful and substantive, and denotes Movants' desire to

---

[5]Movants have argued that presumed receipt pursuant to the mailbox rule constitutes notice. Brief in Support, Dckt. No. 186, p. 20-21. However, the court in In re Graham held that the mailbox rule creates a presumption that receipt occurred at its regular time, not that receipt occurred at dispatch. 290 B.R. 424, 432 (Bankr. N.D. Ga. 2003) ("[I]f a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed, from the known course of business in the post-office department, that it reached its destination at the regular time, and was received by the person to whom it was addressed.").

[6]"Lessor shall give Lessee notice of each and every Event of Default as it or they occur and Lessee shall have ten (10) days from the date of the *receipt* of such notice to cure any and all Events of Default . . . ." Sublease, Dckt. No. 176, ¶ 27 (emphasis added).

[7]"Lessor shall have the right and option . . . to terminate this Lease by written notice to Lessee . . . ." Sublease, Dckt. No. 176, ¶ 27. "If . . . it shall be required . . . to serve any notice . . . upon the party, . . . such notice . . . shall be in writing, signed by the party serving the same, *deposited* in registered or certified United States Mail . . . ." Sublease, Dckt. No. 178, ¶ 37 (emphasis added).

set a different standard for notice. As such, Movants contend that the lease was properly terminated when the notice of termination was placed in the mail, on December 10, 2009.

This Court finds such a reading of the contract unreasonable. To presume that notice of termination was effective as it sat in the mailbox is both unrealistic and out of line with Georgia law. "[W]here notice is required to be given, it is generally held, in the absence of anything appearing to the contrary, that the notice is not complete until it is received; and that, while mailing a notice duly directed and stamped may furnish presumptive evidence of its receipt, it does not alone constitute notice." Favors, 150 Ga. App. at 744 (construing statutory notice provision) (citations omitted).

While Favors was interpreting a notice provision of a worker's compensation statute, the Georgia Court of Appeals has elaborated this position, stating unequivocally that "[t]his is a rule not merely of statutory construction; it is also applicable in the construction of contracts." Menke v. First Nat. Bank of Atlanta, 168 Ga. App. 495, 497 (1983). This is because the notice was not "given" until received. Until then it had merely been "sent." While the notice provision at hand does not contemplate "giving" notice, it does contemplate "serving" notice. Because the contract is silent as to what constitutes "service" in this context, I find that the Georgia presumption requiring receipt controls in this case.

Further, that presumption is bolstered by the oft-cited equitable maxim

AO 72A
(Rev. 8/82)

"equity abhors a forfeiture." *See e.g.*, In re D'Lites of America, Inc., 66 B.R. at 560. It has also been stated that "[t]he law disfavors forfeitures . . . ." McLaurin v. Shell Western E. & P., Inc., 778 F.2d 235, 237 (5th Cir. 1985). Despite this maxim, forfeitures are sometimes necessary, such as where debtors are unable to unwilling to pay their debts. In re Wieseler, 934 F.2d 965, 967 (8th Cir. 1991). However, in the instant case I am persuaded that the maxim tips the scales. Thus, the Certified Mail notice of termination was not effective until after the Chapter 11 was filed.

Because I find that the termination was not effective before the petition was filed, I do not need to consider any of Movant's other theories or Debtor's other defenses pertaining to those theories.

### O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the Motion for Relief from Stay is denied.

 

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This \_\_8__ day of July, 2010.

AO 72A
(Rev. 8/82)